UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
WEST PALM BEACH DIVISION

| | |
|---|---|
| Jason Goldstein, individually and on behalf of all others similarly situated,<br><br>      Plaintiff,<br><br>  - against -<br><br>Beliv LLC,<br><br>      Defendant | Class Action Complaint<br><br>Jury Trial Demanded |

Plaintiff alleges upon information and belief, except for allegations pertaining to Plaintiff, which are based on personal knowledge:

1. Beliv LLC ("Defendant") manufactures, labels, markets, and sells fruit punch nectar represented as having "No Preservatives" under the Nectar Petit brand ("Product").



**I.   "NO PRESERVATIVES" CLAIM IS MISLEADING BECAUSE THE PRODUCT CONTAINS PRESERVATIVES**

2. Preservatives are defined as something that preserves or have the power of preserving, specifically, an additive used to protect against decay, discoloration, or spoilage.

3. The representation that the Product contains "No Preservatives" is false, deceptive, and misleading, because the Product contains citric acid and ascorbic acid ingredients, which are preservatives and function as preservatives.

**Ingredients:** Water, Peach, Apple and Pear Pulp Concentrate, Sugar, Peach Flavor, Clarified Apple Juice Concentrate, ==Citric Acid (as Acidulant)==, Cellulose Gum (as Stabilizer) and ==Vitamin C (as Ascorbic Acid)==.

4. Even though the component juices of the Product contain relatively low pH levels, foodborne pathogens can survive pasteurization.

5. The addition of the preservatives, citric acid and ascorbic acid, ensure that if any undesirable organisms survive, the food remains safe to eat if it is consumed within a reasonable amount of time.

**II.   CITRIC ACID AND ASCORBIC ACID FUNCTION AS PRESERVATIVES IN THE PRODUCT**

6. Citric acid and ascorbic acid perform multiple functions directly related to preserving the Product.

7. This includes helping to control the pH level, preventing microbial spoilage, and acting as buffering and chelating agents.

A. <u>Acidulants</u>

8. Citric acid and ascorbic acid are acidulants, which contribute to the Product's tart, sour, and acidic taste.

9.  As acidulants, the addition of citric acid and ascorbic acid increases the acidity of the Product, which lowers its pH.

10. This creates conditions which inhibit microbial spoilage from bacteria, yeasts, and molds.

11. The result is that the Product is preserved because it can remain stable and consumable for longer periods after it is first made.

12. FBC Industries, Inc., a preservative manufacturer, describes citric acid as "the most commonly used acidulant in the industry" because of its preservative qualities.

13. The Food Additive User's Handbook describes ascorbic acid as a "typical acidulant" used in food processing as a preservative.

B.  Chelating Agents

14. Citric acid and ascorbic acid act as chelating agents in the Product to remove traces of heavy metals.

15. The removal of traces of heavy metals prevents the premature oxidation of the Product.

16. The chelating agents of citric acid and ascorbic acid function as, and are preservatives, because they increase the Product's shelf life, and maintain its original taste, color and appearance.

C.  Microbial Agents

17. Citric acid and ascorbic acid are also used as antimicrobial agents in the Product.

18. The addition of citric acid and ascorbic acid limit growth and toxin production of molds such as Aspergillus parasiticus and A. versicolor, which have been shown to exist in apple, pear, and peach juices, those used in the Product.

19. The low pH of ascorbic acid helps to prevent microbial growth in the Product, thereby preventing spoilage and preserving freshness.[1]

D. <u>Buffering Agents</u>

20. Citric acid and ascorbic acid are also used as buffering agents in the Product.

21. Although buffers can be either weakly acidic or weakly basic, citric acid and ascorbic acid are acidic buffers.

22. A buffering agent helps to maintain a constant pH, preventing batch-to-batch inconsistencies in the Product.

23. The result of a constant pH is a product which will last longer on the shelf than a product with a variable pH, because it will be more stable.

E. <u>Antioxidants</u>

24. Citric acid and ascorbic acid are the most common antioxidant additives.

25. By definition, antioxidants are oxygen scavengers and prevent oxidation, preserving the Product.

26. The addition of citric acid and ascorbic acid prevents the Product from spoiling prematurely, which allows it to remain consumable and shelf-stable for a longer period of time after being made.

27. The Product contains apple ingredients in the form of pulp concentrate and juice.

28. Ascorbic acid is added to all commercial apple juice preparations during pressing or immediately after, and prior to pasteurization.

29. Ascorbic acid reverses the oxidation of apple juice constituents, promoting stability

---

[1] Kirk-Othmer Food and Feed Technology

and shelf-life.

30. The result is that ascorbic acid in apple juice functions as an anti browning agent, by preserving the naturally light color, and maintains its freshness.

F. Effects on Color

31. Citric acid and ascorbic acid also prevent discoloration, which allows the Product to maintain its natural color longer.

32. This means that consumers will buy the Product a longer period of time after it is first made, because the acids help preserve the Product's original color.

**III. LABELING THE PRODUCT "NO PRESERVATIVES" IS MISLEADING**

A. Consumers Value Foods Without Preservatives

33. Market research firm Mintel has shown that 84 percent of Americans buy foods with "free from" claims, because they are seeking foods that are more natural and less processed.

34. Over forty percent of consumers believe foods with "free from" claims are healthier and safer than foods without such a claim.

35. Representing a product as not having preservatives is valued by over seventy percent of consumers.

36. According to a 2015 Nielsen survey, almost ninety percent of Americans are willing to pay more for healthier foods, understood as being made without additives such as preservatives.

37. Consumers believe that products without preservatives are healthier and fresher than those with additives like preservatives.

38. Consumers are misled because the front label promotes the Product as having "No Preservatives" even though it contains citric acid and ascorbic acid, which fulfill numerous preservative functions.

B. <u>Legal Authority Requires Affirmative Disclosure of Preservatives</u>

39. Federal and identical state law require that any food containing a chemical preservative disclose this fact. 21 U.S.C. § 343(k).

40. Federal and identical state law requires the Product to disclose that it contains the chemical preservatives of citric acid and ascorbic acid, in a manner that such statement are likely to be read by the ordinary person under customary conditions of purchase and use of the Product. 21 C.F.R. § 101.22(c).

41. By not disclosing the use of chemical preservatives, and further, asserting the Product contains "No Preservatives," misleads reasonable consumers.

C. <u>Ingredient List Misleads Consumers About Use of Chemical Preservatives</u>

42. Federal and identical state law require that a food to which chemical preservatives are added include a label declaration stating both the common or usual name of the ingredients and a separate description of its function, such as "Citric [or Ascorbic] Acid (preservative)." 21 C.F.R. § 101.22(j).

43. The FDA has informed consumers that if they are looking for foods containing preservatives, they should check to see if the ingredients include ascorbic acid or citric acid.

44. In 2010, the FDA, relying on 21 C.F.R. § 101.22, warned a company selling pineapple and coconut products which failed to truthfully disclose "they contain[ed] the chemical preservative[s] ascorbic acid and citric acid [because] their labels fail[ed] to declare these preservatives with a description of their functions" as preservatives, such as slowing spoilage or promoting color retention.

45. Defendant misleads consumers beyond the front label statement of "No Preservatives" by its parenthetical descriptions of the functions of citric acid and ascorbic acid in

the Product ingredient list.

46. Consumers who view the ingredient list are not told that citric acid and ascorbic acid are chemical preservatives because it fails to designate the function of citric acid and ascorbic acid as preservatives.

47. Instead, the ingredient list misleads consumers by listing "Vitamin C (as Ascorbic Acid)."

48. Ascorbic acid is the ingredient added to the Product, but by listing it within parentheses after "Vitamin C," consumers are likely to pay less attention to it.

49. Ascorbic acid is a chemically modified form of vitamin C, used in foods as a preservative. 21 C.F.R. § 182.3013; 7 C.F.R. § 205.605(b).

50. While ascorbic acid and vitamin C are authorized synonyms, this is only in the context for listing nutrient information, not in the ingredient list. 21 C.F.R. § 101.9(c)(8)(v).

51. Citric acid is a preservative yet listing it as an acidulant will not inform consumers it is, and functions as, a preservative, regardless of whether it also can be considered an acidulant.

52. By utilizing a parenthetical description authorized for chemical preservatives, Defendant concedes citric acid and ascorbic acid are chemical preservatives.[2]

53. Consumers are less likely to understand what an acidulant is, compared to a preservative.

54. Defendant's subjective description of these ingredients as an acidulant and "Vitamin C" is misleading, and contrary to what is required by law.

55. This inhibits consumers from learning the truth from the ingredient list, that the "No

---

[2] A parenthetical description is permitted only for other ingredient types like leavening agents, dough conditioners, and yeast nutrients.

Preservatives" claim is false, deceptive, and misleading, even though they are not required to scrutinize the ingredient list to confirm or debunk the front label promise of "No Preservatives."

**IV. CONCLUSION**

56. Defendant makes other representations and omissions with respect to the Product which are false and misleading.

57. Reasonable consumers must and do rely on a company to honestly and lawfully market and describe the components, attributes, and features of a product, relative to itself and other comparable products or alternatives.

58. The value of the Product that Plaintiff purchased was materially less than its value as represented by Defendant.

59. Defendant sold more of the Product and at higher prices than it would have in the absence of this misconduct, resulting in additional profits at the expense of consumers.

60. Had Plaintiff and proposed class members known the truth, they would not have bought the Product or would have paid less for it.

61. As a result of the false and misleading representations, the Product is sold at a premium price, approximately no less than $1.59 per 11.2 oz, excluding tax and sales, higher than similar products, represented in a non-misleading way, and higher than it would be sold for absent the misleading representations and omissions.

Jurisdiction and Venue

62. Jurisdiction is proper pursuant to Class Action Fairness Act of 2005 ("CAFA"). 28 U.S.C. § 1332(d)(2).

63. The aggregate amount in controversy exceeds $5 million, including any statutory damages, exclusive of interest and costs.

64. Plaintiff Jason Goldstein is a citizen of Florida.

65. Defendant Beliv LLC is a Puerto Rico limited liability company with a principal place of business in San Juan, San Juan County, Puerto Rico and upon information and belief, at least one member of defendant is not a citizen of the same state as the plaintiff.

66. The class of persons Plaintiff seeks to represent includes persons who are citizens of different states from which Defendant is a citizen

67. Beliv LLC is a wholly owned subsidiary of Beliv Global LLC, a Puerto Rico limited liability company with a principal place of business in San Juan, Puerto Rico.

68. Ninety-five (95) percent of Beliv Global LLC is owned by The Central America Bottling Corporation ("CBC"), a British Virgin Islands limited liability corporation, with a principal place of business in Guatemala City, Guatemala.

69. CBC is a member of Defendant and a citizen of a foreign state, Guatemala and the British Virgin Islands.

70. The members of the class Plaintiff seeks to represent are more than 100, because the Product has been sold for several years, with the representations described here, in thousands of locations, in the states covered by Plaintiff's proposed classes.

71. The Product is available to consumers from grocery stores, dollar stores, warehouse club stores, drug stores, convenience stores, big box stores, and online.

72. Venue for this action is proper in this Court because a substantial part of the events or omissions giving rise to these claims occurred in Palm Beach County, including Plaintiff's purchase, consumption, and/or use of the Product and awareness and/or experiences of and with the issues described here.

Parties

73. Plaintiff Jason Goldstein is a citizen of Delray Beach, Palm Beach, Florida.

74. Defendant Beliv LLC is a Puerto Rico limited liability company with a principal place of business in San Juan, Puerto Rico, San Juan County.

75. Defendant's parent company, CBC, is a leading producer, distributor and seller of beverages, such as carbonated soft drinks ("CSDs"), juices and nectars, bottled water, isotonics, energy drinks, tea and beer.

76. CBC's products include 487 brands and 2,945 stock keeping units ("SKU").

77. This includes 142 brands and 1,727 SKUs that are owned and developed by third parties, such as PepsiCo, AmBev, and Beliv.

78. Beliv LLC is the commercial research, development, and marketing hub for CBC's Beliv division.

79. Through Beliv, CBC manages new ventures in expanding its portfolio of proprietary brands and developing new products for its health and wellness segments.

80. Since Beliv's center of operations is in Puerto Rico, it allows easy access to markets in the United States and outside of the Western Hemisphere.

81. Additionally, Beliv's location within United States jurisdiction allows it greater ability to protect its intellectual property under this nation's intellectual property laws.

82. Nectar Petit is one of Beliv's proprietary brands that was started to develop healthier and more natural and nutritional products, which capitalize on the fruit ingredients grown throughout Latin America and the Caribbean.

83. Nectar consists of fruit juice, water, pulp, and sugar.

84. Nectar is considered an authentic, traditional beverage, as the villagers who invented

it derived energy for their daily tasks from consuming the fruit's pulp, instead of discarding it.

85. Defendant sells its Nectar Petit nectars in flavors including fruit punch, apple, mango, pineapple, guava, and peach.

86. The Products are sold throughout the United States.

87. This success owes to Defendant's quality products, the increasing appreciation of Americans for foods from Latin America, and the steadily increasing number of immigrants from Latin America and the Caribbean.

88. Plaintiff and at least one of defendant's members have citizenship diverse from each other, because Plaintiff is a citizen of Florida and one of Defendant's members, CBC, is a citizen of the foreign states, Guatemala and the British Virgin Islands.

89. Defendant transacts business within this district, through the marketing, supply, and sales of its products at numerous physical stores within this district.

90.

91. Plaintiff purchased the Product on one or more occasions within the statutes of limitations for each cause of action alleged, at stores including Publix, 9239 W Atlantic Ave, Delray Beach, FL 33446, between March 1, 2022, and April 1, 2022, and/or among other times.

92. Plaintiff believed and expected the Product did not contain preservatives because that is what the representations and omissions said and implied, on the front label and the absence of any reference or statement elsewhere on the Product.

93. Plaintiff seeks to purchase foods including beverages without additives such as preservatives because he believes these ingredients are potentially bad for you and are made through chemical processes with synthetic ingredients.

94. Plaintiff relied on the words, terms coloring, descriptions, layout, placement,

packaging, tags, and/or images on the Product, on the labeling, statements, omissions, claims, statements, and instructions, made by Defendant or at its directions, in digital, print and/or social media, which accompanied the Product and separately, through in-store, digital, audio, and print marketing.

95. Plaintiff bought the Product at or exceeding the above-referenced price.

96. Plaintiff would not have purchased the Product if he knew the representations and omissions were false and misleading or would have paid less for it.

97. Plaintiff chose between Defendant's Product and products represented similarly, but which did not misrepresent their attributes, requirements, instructions, features, and/or components.

98. The Product was worth less than what Plaintiff paid and he would not have paid as much absent Defendant's false and misleading statements and omissions.

99. Plaintiff intends to, seeks to, and will purchase the Product again when he can do so with the assurance the Product's representations are consistent with its abilities, attributes, and/or composition.

100. Plaintiff is unable to rely on the labeling and representations not only of this Product, but other similar juice beverages containing no preservatives, because he is unsure whether those representations are truthful.

Class Allegations

101. Plaintiff seeks certification under Fed. R. Civ. P. 23 of the following classes:

> **Florida Class:** All persons in the State of Florida who purchased the Product during the statutes of limitations for each cause of action alleged; and
>
> **Consumer Fraud Multi-State Class**: All persons in the States of Georgia, Alabama, Arkansas, and South Carolina who purchased the Product during the

statutes of limitations for each cause of action alleged.

102. Common questions of issues, law, and fact predominate and include whether Defendant's representations were and are misleading and if Plaintiff and class members are entitled to damages.

103. Plaintiff's claims and basis for relief are typical to other members because all were subjected to the same unfair, misleading, and deceptive representations, omissions, and actions.

104. Plaintiff is an adequate representative because his interests do not conflict with other members.

105. No individual inquiry is necessary since the focus is only on Defendant's practices and the class is definable and ascertainable.

106. Individual actions would risk inconsistent results, be repetitive and are impractical to justify, as the claims are modest relative to the scope of the harm.

107. Plaintiff's counsel is competent and experienced in complex class action litigation and intends to protect class members' interests adequately and fairly.

108. Plaintiff seeks class-wide injunctive relief because the practices continue.

<u>Florida Deceptive and Unfair Trade Practices Act
("FDUTPA"), Fla. Stat. § 501.201 et seq.</u>

<u>(Consumer Protection Statute)</u>

109. Plaintiff incorporates by reference all preceding paragraphs.

110. Plaintiff believed the Product did not contain preservatives.

111. Defendant's false, misleading and deceptive representations and omissions are material in that they are likely to influence consumer purchasing decisions.

112. Defendant misrepresented the Product through statements, omissions, ambiguities,

half-truths and/or actions.

113. Plaintiff relied on the representations and omissions to believe the Product did not contain preservatives.

114. Plaintiff and class members would not have purchased the Product or paid as much if the true facts had been known, suffering damages.

Violation of State Consumer Fraud Acts

(On Behalf of the Consumer Fraud Multi-State Class)

115. The Consumer Fraud Acts of the States in the Consumer Fraud Multi-State Class are similar to the consumer protection statute invoked by Plaintiff and prohibit the use of unfair or deceptive business practices in the conduct of commerce.

116. The members of the Consumer Fraud Multi-State Class reserve their rights to assert their consumer protection claims under the Consumer Fraud Acts of the States they represent and/or the consumer protection statute invoked by Plaintiff.

117. Defendant intended that members of the Consumer Fraud Multi-State Class would rely upon its deceptive conduct.

118. As a result of Defendant's use of artifice, and unfair or deceptive acts or business practices, the members of the Consumer Fraud Multi-State Class sustained damages.

119. Defendant's conduct showed motive and a reckless disregard of the truth such that an award of punitive damages is appropriate.

Breaches of Express Warranty,
Implied Warranty of Merchantability/Fitness for a Particular Purpose and
Magnuson Moss Warranty Act, 15 U.S.C. §§ 2301, *et seq*.

120. The Product was manufactured, identified, marketed and sold by Defendant and expressly and impliedly warranted to Plaintiff and class members that it did not contain

preservatives.

121. Defendant directly marketed the Product to Plaintiff and consumers through its advertisements and marketing, through various forms of media, on the packaging, in print circulars, direct mail, product descriptions distributed to resellers, and targeted digital advertising.

122. Defendant knew the product attributes that potential customers like Plaintiff were seeking and developed its marketing and labeling to directly meet those needs and desires.

123. Defendant's representations about the Product were conveyed in writing and promised it would be defect-free, and Plaintiff understood this meant that it did not contain preservatives.

124. Defendant's representations affirmed and promised that the Product did not contain preservatives.

125. Defendant described the Product so Plaintiff and consumers believed it did not contain preservatives, which became part of the basis of the bargain that it would conform to its affirmations and promises.

126. Defendant had a duty to disclose and/or provide non-deceptive descriptions and marketing of the Product.

127. This duty is based on Defendant's outsized role in the market for this type of Product, a trusted brand known for the highest quality products.

128. Plaintiff recently became aware of Defendant's breach of the Product's warranties.

129. Plaintiff provided or will provide notice to Defendant, its agents, representatives, retailers, and their employees.

130. Plaintiff hereby provides notice to Defendant that it breached the express and implied warranties associated with the Product.

131. Defendant received notice and should have been aware of these issues due to complaints by third-parties, including regulators, competitors, and consumers, to its main offices, and by consumers through online forums.

132. The Product did not conform to its affirmations of fact and promises due to Defendant's actions.

133. The Product was not merchantable because it was not fit to pass in the trade as advertised, not fit for the ordinary purpose for which it was intended and did not conform to the promises or affirmations of fact made on the packaging, container or label, because it was marketed as if it did not contain preservatives.

134. The Product was not merchantable because Defendant had reason to know the particular purpose for which the Product was bought by Plaintiff, because he expected it did not contain preservatives, and he relied on Defendant's skill and judgment to select or furnish such a suitable product.

135. Plaintiff and class members would not have purchased the Product or paid as much if the true facts had been known, suffering damages.

Negligent Misrepresentation

136. Defendant had a duty to truthfully represent the Product, which it breached.

137. This duty was non-delegable, and based on Defendant's position, holding itself out as having special knowledge and experience in this area, a trusted brand known for the highest quality products.

138. Defendant's representations and omissions regarding the Product went beyond the specific representations on the packaging, as they incorporated the extra-labeling promises and commitments to quality, transparency and putting customers first, that it has been known for.

139. These promises were outside of the standard representations that other companies may make in a standard arms-length, retail context.

140. The representations took advantage of consumers' cognitive shortcuts made at the point-of-sale and their trust in Defendant.

141. Plaintiff and class members reasonably and justifiably relied on these negligent misrepresentations and omissions, which served to induce and did induce, their purchase of the Product.

142. Plaintiff and class members would not have purchased the Product or paid as much if the true facts had been known, suffering damages.

## Fraud

143. Defendant misrepresented and/or omitted the attributes and qualities of the Product, that it did not contain preservatives.

144. Moreover, the records Defendant is required to maintain, and/or the information inconspicuously disclosed to consumers, provided it with actual and constructive knowledge of the falsity and deception, through statements and omissions.

145. Defendant knew of the issues described here yet did not address them.

146. Defendant's fraudulent intent is evinced by its knowledge that the Product was not consistent with its representations.

## Unjust Enrichment

147. Defendant obtained benefits and monies because the Product was not as represented and expected, to the detriment and impoverishment of Plaintiff and class members, who seek restitution and disgorgement of inequitably obtained profits.

<u>Jury Demand and Prayer for Relief</u>

Plaintiff demands a jury trial on all issues.

**WHEREFORE**, Plaintiff prays for judgment:

1. Declaring this a proper class action, certifying Plaintiff as representative and the undersigned as counsel for the class;

2. Entering preliminary and permanent injunctive relief by directing Defendant to correct the challenged practices to comply with the law;

3. Injunctive relief to remove, correct and/or refrain from the challenged practices and representations, and restitution and disgorgement for members of the class pursuant to the applicable laws;

4. Awarding monetary damages, statutory and/or punitive damages pursuant to any statutory claims and interest pursuant to the common law and other statutory claims;

5. Awarding costs and expenses, including reasonable fees for Plaintiff's attorneys and experts; and

6. Other and further relief as the Court deems just and proper.

Dated:   April 26, 2022

Respectfully submitted,

/s/Alexander J. Korolinsky
Alexander J. Korolinsky
AJK Legal
1001 Brickell Bay Dr Ste 2700
Miami FL 33401
Tel: (877) 448-8404
korolinsky@ajklegal.com

Sheehan & Associates, P.C.
Spencer Sheehan*
60 Cuttermill Rd Ste 412
Great Neck NY 11021
Tel: (516) 268-7080

spencer@spencersheehan.com

*Pro Hac Vice Forthcoming